PELLAS *v.* MOTLEY *et al.*

*(Supreme Court, General Term, First Department.* May 13, 1892.)

CONTRACTS—FAILURE TO PERFORM—MISREPRESENTATIONS—EVIDENCE.

Plaintiff contracted to sell defendant certain steamers, warehouses, etc., in Nicaragua, and also a certain concession by Nicaragua for the exclusive navigation of the San Juan river and Lake Nicaragua. Defendant deposited a sum with a bank, under the agreement that it should be paid to plaintiff as liquidated damages if defendant failed to carry out the agreement. Defendant refused to complete the purchase on the ground that plaintiff had misrepresented the value of the property, and plaintiff sued to obtain the deposit. The evidence was conflicting as to the representations, and as to the real value, and as to when and why defendant refused to carry out the agreement; but there was much to throw discredit on defendant's evidence, and some evidence that he did not refuse to complete the purchase until he had failed to form a corporation, and sell its stock, and obtain certain contracts. *Held,* that a judgment for plaintiff should not be disturbed.

Appeal from special term, New York county.

Action by Francisco A. Pellas against Thornton N. Motley and others. From a judgment for plaintiff, defendants appeal. Affirmed.

Argued before VAN BRUNT, P. J., and O'BRIEN and ANDREWS, JJ.

*Wingate & Cullen, (George W. Wingate,* of counsel,) for appellants. *E. Louis Lowe,* for respondent.

ANDREWS, J. On April 11, 1889, the plaintiff and the defendants Motley and Macaulay entered into a written contract, which was executed at the city of New York, whereby the plaintiff agreed to sell, and said Motley and Macaulay agreed to purchase, for the price of $300,000 in cash, certain steamers, boats, warehouses, machine shops, shipyards, and other property, situated in the republic of Nicaragua, in Central America, and also a certain concession or right given to the plaintiff by said state of Nicaragua for the exclusive navigation of the San Juan river and Lake Nicaragua. By the terms of the agreement, the plaintiff, on or before June 10, 1889, was to execute and deliver to said Motley and Macaulay proper conveyances and transfers of all of said property. The said sum of $300,000 was to be paid in installments,—$45,000 upon the delivery of such transfers and conveyances, and the remainder, except $5,000, in five installments of $50,000 each, to be paid during the years 1889, 1890, and 1891. The agreement also provided that $5,000 of such $300,000 should be deposited in the Commercial National Bank of the city of New York at the time of the execution of the agreement, and that, in case said Motley or Macaulay should fail to carry out the agreement on their part, said $5,000 should be paid by said bank to the plaintiff as liquidated damages, and not as a penalty for the breach of such agreement. The agreement also contained the following provision: "The said Pellas shall meet the duly-authorized agent or agents of said Motley and Macaulay at Greytown, Nicaragua, on or before the 1st day of May, A. D. 1889, for the purpose of assisting said agent or agents in inspecting and examining said concession and checking said property." Shortly afterwards one Burt and one Snyder, who had been appointed the agents of said Motley and Macaulay, went to Nicaragua with the plaintiff, and there made an examination of all the property in question. After such agents had made some examination of the said property, and on May 11, 1889, they sent from Granada the following telegram, addressed to Motley, at New York: "Pellas plant valued at one hundred thousand dollars. Concession represents the balance. Everything is satisfactory. Cost and expenses will be about one hundred thousand to place in condition for canal business. Will have lawyer's opinion. Shall we close?" To this telegram Motley and Macaulay sent a reply by cable, which was, "Close nothing." Subsequently, under dates of May 4, 1889, May 21, 1889, and May 25, 1889, Snyder and Burt made very elaborate written reports in relation to the property in question and said concession. These reports were

drawn up by Burt, and were signed by him and Snyder, and brought from Nicaragua to New York by Snyder, and came into the hands of the defendants Motley and Macaulay about the 10th of June. Burt remained in Nicaragua until about August 4th, but the plaintiff returned at the same time with Snyder. Subsequently said Motley refused to carry out the agreement, upon the ground that the plaintiff had made certain representations as to the conditions and value of such property, which, upon the examination by said agents, had been ascertained to be false. This action was then brought to compel the defendant Motley to join with the plaintiff in an order requiring the bank and the defendant Flannagan, its cashier, to pay said sum of $5,000 to plaintiff, and to compel the bank to pay said $5,000 to plaintiff pursuant to such order. An answer purporting to be a joint answer of the defendants Motley and Macaulay was served, but the defendant Macaulay does not really defend the action, and was a witness on behalf of the plaintiff upon the trial. The defendant Motley claims that plaintiff represented to him and others that all the property covered by the agreement of April 11, 1889, was in first-class condition, and, irrespective of the value of the concession from the state of Nicaragua, was worth at least $300,000. The plaintiff admits that he represented to Motley that the steamers and other water craft were in fair running order, and that all the property was in fair serviceable condition; but he denies that he ever represented that the property was worth the sum of $300,000, or any other particular sum.

Upon the question as to what representations were made by the plaintiff in regard to the property there is a direct and irreconcilable conflict of testimony. The defendant Motley and his brother, and one Adams, swear positively that the plaintiff on various occasions did state in their presence that the steamers, warehouses, wharves, and other property were in first-class condition, and required but small repairs. On the other hand, the plaintiff and the defendant Macaulay swear with equal positiveness that the plaintiff never made any such representations, and that his statements were merely to the effect that the steamers and other water craft were in fair running order, and that all the property was in a fair serviceable condition; and the plaintiff and said Macaulay also testify positively that the plaintiff, instead of stating that but a small sum would be required for repairs, repeatedly stated that it would be necessary for the defendants to expend from $50,000 to $75,000 in repairs, in order to put the property in first-class condition. They also testify that the plaintiff never stated that the property was worth $300,000, or any other particular sum. Counsel for the defendant Motley concedes that there is such conflict in the testimony, but insists that, in view of all the circumstances, the account of the matter given by the defendant Motley and his witnesses is the more probable of the two, because, as such counsel claims, it is highly improbable that Motley should have entered into the agreement of April 11, 1889, unless the plaintiff had represented that the property was in good condition, and had made statements in regard to the actual value of the same. The difficulty about this argument is that, in view of the fact that Motley entered into the agreement, it is difficult to determine what the probabilities as to the making of the representations are. The surprising thing about the matter is that Motley should have entered into the agreement at all. The plaintiff and defendant Macaulay were total strangers to the defendant Motley until the negotiations for the sale commenced. At that time Macaulay was introduced to Motley, and soon after the former introduced Pellas to the latter. The agreement of April 11th was an absolute agreement on the part of Motley and Macaulay to buy the property therein mentioned, and the execution of the agreement was not, according to its terms, in any way dependent upon the report which should be made by the agents sent to Nicaragua by Motley and Macaulay. The written instructions given by Motley and Macaulay to such agents did not direct them to make an examination of the

property, for the purpose of ascertaining its value, but for the purpose of ascertaining what repairs would be necessary. No matter what representations were made, it is incomprehensible to us how Motley, if he were a man of any business prudence, and considered the question of the condition and value of the property as of any importance, could have joined an entire stranger in an agreement to purchase property located in a foreign country, from another entire stranger, at the price of $300,000 in cash, without having some previous examination of such property made. The fact that he did enter into such an agreement renders it impossible to say what the probabilities are as to whether he would enter into such an agreement, in the absence of representation by the plaintiff as to the condition and value of the property; because it seems to us about as improbable that he should enter into the agreement, if such representations were made as if they were not made. Moreover, looking to the question of probabilities, there is force in the suggestion made by plaintiff's counsel. As above stated, the agreement provided that the plaintiff should meet the agents of Motley and Macaulay on or before May 1, 1889, and the actual conveyance of the property was not to be made until on or before June 10th. The plaintiff knew, therefore, that although the agreement to buy the property was absolute, and not conditional upon the report of the agents, such agents would examine the property, and report to Motley and Macaulay, before they accepted a conveyance of the property, and before any part of the $300,000 was paid to the plaintiff. There is some force, therefore, in the suggestion of plaintiff's counsel that under these circumstances it is in the highest degree improbable that the plaintiff would make such grossly false statements as to the condition and value of the property as it is claimed he made, when he must have known that the falsity of his statements would be discovered by such agents, and would be reported to Motley, before a conveyance of the property was accepted, and before any money was paid; and that in such event Motley would have good ground to refuse, and probably would refuse, to carry out the agreement on his part.

With regard to the condition and value of the property, the testimony is also conflicting. As appears by the telegram from the agents to Motley, above quoted, such agents valued the property, aside from the concession, at about $100,000. But they also said, "Everything is satisfactory," and put the inquiry to Motley, "Shall we close?"—such inquiry meaning, as we understand it, to ask whether they should close the whole transaction with Pellas, who was then with them in Nicaragua. Moreover, that part of the report made by said agents to Motley and Macaulay under date of May 25, 1889, contains the following: "We close this report by repeating our last cable to you from Granada. We advise you to complete the purchase." Upon the trial of the action the defendant Motley testified generally as to the condition and value of the property as shown by the reports of said agents; and said agent Burt was also a witness, and testified as to the condition and value of the property. The reports were not produced on behalf of the defendants, and Motley said that they could not be found, and Motley and Burt both appear to have testified under the belief that the original reports were lost, and that no copies were in existence. According to Motley's testimony, based upon the reports, the contents of which had been communicated to the plaintiff, and to Burt's testimony, based upon his personal examination in 1889, the steamers, boats, launches, warehouses, wharves, railroad, houses, and all the other property covered by the agreement of April 11th, were in a very bad condition, and of comparatively little value. The value of the testimony so given by Motley and Burt was, however, very seriously impaired by the subsequent production by plaintiff's counsel of copies of these reports. These reports showed that, while a great deal of such property needed repairs, it was in fair serviceable condition; and such reports contained glowing descriptions of the great value of the concession from the state of Nicaragua,

of the vast amount of business that could be done thereunder, and of the great amount of money which could be made if the agreement of April 11th was carried out.  It thus appeared that, whether from failure of memory, or some other cause, Motley had not testified truthfully as to the contents of the reports, and that Burt had either originally made a false report as to the condition and value of such property, or had, in his testimony given upon the trial, grossly exaggerated the poor condition of the property, and had not testified truthfully as to its value.

It appeared by the testimony that after Motley refused to carry out the agreement of April 11th, the property in question and the concession were sold to the Nicaragua Canal Company, and that one Bell was sent down by that company to look after the property.  Bell was called as a witness for the defendant Motley, and testified as to the poor condition of the property, and its little value.  It plainly appeared, however, that Bell had a grievance against the Nicaragua Canal Company, and desired to make it appear that such company had made a bad bargain in buying the property.  He testified as follows: "I left here [New York city] on the 9th of December, and got back here on the 27th or 28th of January.  I left so soon because I went down there for a purpose, and I found out they had no use for me.  I never got paid yet. They robbed me out of my wages,—the company did.  I didn't sue them for it.  I would not have much of a chance.  I have got no very hard feelings towards that company."  It was quite evident that he did have a very hard feeling against the company, and desired to make out the property to be in as bad condition, and of as little value, as he possibly could.  One Hinman, a commission agent, had seen the property in question, and was called as a witness for the defendants.  He testified to the poor condition of the property, but did not make it out to be in so bad a condition as did Burt.  His testimony, however, as well as that of Motley and Burt, is flatly contradicted by the reports made by Snyder and Burt, above mentioned.  The defendant Macaulay was called by the plaintiff in rebuttal.  He testified to the sale of the property in question to the Nicaragua Canal Company, and that he went down on behalf of that company soon after such sale, to take charge of the property. He testified as follows: "I went down to Nicaragua.  I left here on the 1st of August, I think, of that year, [1889,] for the Nicaragua Canal Construction Company,—a branch of the canal company.  I went down there as their representative.  I reached there on the 25th of August.  I commenced my investigation of the property immediately.  I gave it a careful and itemized investigation.  I examined all those vessels, and all this property testified about by the other witnesses, very carefully.  I found this property in fair serviceable condition.  The representation made by Pellas to Motley and me in all our interviews as regards the character of the property was that it needed repairs all the way through, and from $50,000 to $75,000 ought to be invested in that direction, repairs and new boats, to meet the needs of the new service expected by the advent of the canal; as to its character, it was in useful serviceable order,—in running order.  From $50,000 to $75,000 was Mr. Pellas' statement for repairs and new boats.  It was in that condition.  I examined each and all of these boats.  I heard all this evidence.  I found them running when I went there.  They ran while I was there.  I left them running.  I am not now in the employ of the canal company or the construction company.  I have no connection whatever with the company; not the least.  I am now living in Washington city, engaged in other business.  I have no connection with the canal company, or Mr. Pellas, or with this business; not a particle."

It is claimed by defendant Motley's counsel that, although Macaulay joined with Motley in making the contract, he was acting in the interest of Pellas, and that his testimony, therefore, is not entitled to credit.  In view of the manner in which the testimony of Motley and Burt was contradicted by Burt's

own report, we do not see why Macaulay's testimony is not entitled to as much credit as theirs. The testimony as to when and how Motley refused to carry out the agreement of April 11th is also conflicting. When Synder brought back the reports written by Burt, and signed by both, Burt remained in Nicaragua; and, according to Macaulay's testimony, he remained there under the orders of himself and Motley; and the inference to be drawn from this and other testimony is that Burt expected that the agreement of April 11th would be carried out, and that he would be placed in charge of the property by Motley and Macaulay. Snyder and plaintiff returned at the same time,—about the 8th, 9th, or 10th of June, 1889. About June 10th, Motley saw and read the report written by Burt, and signed by him and Snyder. Motley testified that he refused to have anything more to do with the matter immediately after he had seen such reports. He said: "I saw the report on the arrival of Snyder; * * * right straight off; I judge within a day or two; so that I saw it either on the 10th or 11th or 12th of June. I first gave notice to Mr. Pellas of our refusal to carry out this agreement about the middle of July, in writing. Verbally Mr. Adams and myself gave notice to him shortly afterwards at the Commercial National Bank, right after the report was received,—Mr. Burt's report. Then we made up our minds, Adams and I, positively, upon the receipt of that report, that we would go no further; and we notified Pellas of it immediately, within a day or two, the first conversation we had. I got that report from Snyder on the 10th, 11th, or 12th of June, 1889, and I immediately went to Adams, reported to Adams, and he and I thereupon orally notified Pellas." Mr. Motley seems to be as inaccurate in his testimony on this point as he was as to the contents of the reports. He is contradicted on this point by the plaintiff and Macaulay, and by a variety of circumstances. Pellas had brought a number of documents relating to the title to his property, which were in Spanish, and these documents were at once taken, on his arrival with Snyder, to Motley's attorney, and were subsequently sent to a Spanish lawyer, in order that he might translate the same into English, and draw a proper conveyance of the property. Motley testified that he had nothing to do with the procuring of such translations, or the preparation of such conveyance; but it appeared by his own testimony that he paid the expense of making such translations, and drawing such conveyance. Moreover, on June 29, 1889, he and Macaulay signed and sent the following communication to Pellas:

"CABLE ADDRESS 'HIERARCH,' NEW YORK.
"THORNTON N. MOTLEY & CO., MANUFACTURERS OF AND DEALERS IN HARDWARE AND MACHINERY FOR EXPORT, AND RAILWAY, STEAMSHIP, AND CONTRACTORS' SUPPLIES.
"26 LIBERTY STREET, NEW YORK, June 29th, 1889.
"*F. A. Pellas, Esq.*—DEAR SIR: I regret exceedingly that the examination of reports from our experts sent to Nicaragua, documents, translations, &c., have delayed and prevented a satisfactory conclusion. Regretting this delay, and assuring you of our desire to reach a definite result early next week, I remain, respectfully, yours,          DANIEL MACAULAY.
"T. N. MOTLEY."

Motley seeks to explain his payments to the Spanish lawyer, and his writing the above letter, by saying that Macaulay wanted to go on with the enterprise, and that he made such payment, and wrote such letter, because he was trying to help Macaulay. Notwithstanding such explanation, his conduct seems strange, if, as he testified, he positively refused to go on in the matter as early as the 12th of June. Macaulay testifies that Motley did not say anything about giving up the enterprise when the report was received, and that Motley went on with the matter as before until July 16th, when he refused to proceed. It appears that immediately after the signing of the agreement of April 11th, Motley and his friends caused a company to be

formed under the laws of West Virginia, to which the property in question, when acquired, was to be transferred. They also caused stock and bonds to be engraved, at an expense of about $1,200. It also appears by the testimony that when such agreement was signed Motley and Macaulay had hopes of obtaining a valuable freight contract from the Nicaragua Canal Company, and that, after the agreement was signed, efforts were made to secure such contract, but that the same were unsuccessful. According to Macaulay's testimony, it was not until Motley and himself had failed to sell the bonds and stocks of such company, and had failed to realize money with which to make the first payment of $45,000 to the plaintiff, and not until they had failed to secure such freight contract from the Nicaragua Canal Company, that Motley refused to proceed with the enterprise; and, according to Macaulay's testimony, Motley's refusal to proceed was not because he had ascertained from the report of Snyder and Burt that the representations of the plaintiff as to the condition and value of the property were false, but because they were not able to dispose of the stocks and bonds of such company, and were not able to secure such freight contract from the canal company.

We have examined all the testimony in the case with care, and have found considerable difficulty in reaching a satisfactory conclusion as to what the real facts were in this somewhat extraordinary case. As above stated, it is astonishing that Motley should have entered into the agreement of April 11th, whether the alleged false representations were or were not made to him by the plaintiff. Men do not ordinarily enter into written contracts to pay $300,000 for property in a foreign country upon the mere statement of a total stranger as to its condition and value; and we cannot understand how Motley came to enter into the agreement, unless his expectation, and that of the others interested in the purchase, was to form a company, and dispose of a large amount of bonds and stock, which would be issued without special reference to the value of the property; and, if this was the case, then it is just as probable that he entered into the agreement of April 11th without representations on plaintiff's part as to the condition and value of the property as that he entered into it in reliance upon such representations. The testimony as to what representations were made as to the condition of the property, and as to what the condition of the property actually was, and as to when and why Motley refused to carry out the agreement, is conflicting; and of the inference to be drawn from the surrounding circumstances some seem to sustain one side and some the other. Under these circumstances, we have concluded, though with some hesitation, that the judgment should be affirmed, with costs.

VAN BRUNT, P. J. I am of the opinion that the judgment should be affirmed, with costs.

O'BRIEN, J., concurs in result.